Chelsea Buildings LLC, United States Well, it's a federal district case in re-gulf oil litigation. Where in Fourth Ocean does it say that? Oh, in Fourth Ocean. Fourth Ocean, if I cite from page 212, which begins, essential to the status of an intended beneficiary is either performance of the promise or will satisfy an obligation to pay money to the beneficiary, or the circumstances indicate that promising intends to give the beneficiary the benefit of the promised performance. So that has to be found, as other New York cases have said, that that has to be shown from the face of the contract itself. I thought what you just read said the circumstances indicate. I didn't hear you reading that it says that the contract itself has to explicitly state that. Maybe I just misheard your reading. That the contract itself, the face of the agreement itself, must indicate that the intention was to benefit the third party. That must be found on the face of the contract itself. Are you reading from First Ocean now? Not on that point, Your Honor. I can tell you that is the in re-gulf oil litigation and also that the Fourth Ocean, I will read where it says, or that the language of the contract otherwise clearly evidences an intent to permit enforcement by the contract. Again, referencing that the contract language says they permit enforcement by the third party and that the third party's right to enforce the contract and to recover if the promisor breaches to the third party. There's none of that type of language found in this contract. Forget the circumstances, but even if we look at the circumstances, there's nothing in the circumstances which tell us. The language of the contract says they won't sue the United States for confrontation. Correct. It says that they will not do so. And again, that's in the context of the whole provisions of the agreement. There's no notice requirement to the United States. There's no provision by which the United States may enforce this contract. The contract contains very extensive details. A lot of cases where there's no provision specifically saying that the third party can enforce it. Many of them. Hardly, and you look at the restatement, you look at the New York cases, there aren't statements in the contract that the third party can enforce. Well, that's what, as I read Fourth Ocean, certainly New York's highest court has said that it is required to prove that the third party must establish that it has a right to enforce the contract. It may even go further in the cases and say that that right must be such that no other party but the third party can recover. That's an either-or. That's an either-or. It says either it has to be clear that no one other than the third party can enforce or the circumstances indicate an intent of the parties to allow the third party to enforce. So, I mean, the problem is that you've got much more express language here than you have in other cases. So can you cite us to a case where there was express language that says, you know, I won't to my neighbor. Correct. And the court said that's unenforceable by the neighbor. Yes. The case is the perfect example. The only case in New York that a covenant not to sue was tried to be enforced by a third party, and we cite it in our briefing, is the Clavis versus Clock case. The fellow who was the delivery man for Schwann's Dairy had a employment agreement that had a very- The language in that agreement was specifically saying that it was for the benefit of the other contracting party, right? Well, the language in that agreement had a specific provision where the employee said, I will not sue the client. Yes, but it was prefaced by giving a reason that they were worried about the person coming back to sue the contracting party, right? Just as this agreement gives a reason, and the reason at the very beginning of this agreement is the intent for New York City to achieve certain objectives, not for the United States. In that Clock case, which the New York court looked at, it said, I agree not to sue the clients of my employer if I'm injured there for the benefit of my employer. But there was a precatory clause, as Judge Dyke points out, that said that the concern had to do with workers' compensation claims, right? Correct, as in this case. This case itself had the precatory clause in which it says this agreement is intended for the purpose of the city of New York achieving certain objectives, none of which had anything to do with conferring benefits on the United States. And that's on the first page of the agreement. And I see my time has expired. Why don't we – we'll give you two minutes for rebuttal, Mr. Hunt. Thank you. Ms. Wang.  May it please the Court. In 2005, plaintiffs entered agreements promising, quote, not to sue or join any action seeking compensation from the United States with respect to the High Line Situ. And in 2011, plaintiffs sued the United States with respect to the High Line Situ. The plaintiffs assert that the unambiguous provision of the agreements somehow means something other than the plain language of those words. But their arguments are simply not supported by the record or by the case law. The United States is clearly the intended third-party beneficiary and is the party that is entitled to assert this provision as a defense in a case in which plaintiffs sued the United States. Why does it even make sense, though, for these owners? I mean, it's one thing to say, okay, we've been negotiating with the city and we're going to let this go forward. So we're stuck with, you know, the High Line over our heads. But why would it even make sense for them to say, and you, city, we're going to let you go forward, but we're going to also waive all of our rights to compensation under a takings claim? Well, Your Honor, the circumstances surrounding this deal, which is all explained, for example, in Mr. Gunn's declaration and even in the deposition of Mr. Toback, who was general counsel for West Chelsea Buildings, indicate that the plaintiffs understood that this was the deal they were making, that in exchange for receiving valuable development rights through the city's promise to rezone and give the owners along the High Line corridor additional development rights that no one else in the district would get, that that was something valuable that they were getting. That was a certain benefit that they were getting. Well, they debate whether or not no one else could get it, that they claim it was not limited to just them. But putting that question aside, isn't it just as reasonable to assume that those benefits were in exchange for not fighting the sit-through? I mean, the United States had already agreed to declare abandonment, right? There were – the parties, the Chelsea property owners and some of the parties had, prior to 2002, been engaged in discussions with the STB about abandonment. And then when Mayor Bloomberg was elected in 2002, the parties began discussing – The parties were going down the road with the federal government. The federal government was prepared to allow abandonment, and then they would have been able to move forward and do what they want with their properties, right? That is what they allege. Actually, there's no – the CFC did not make findings on the nature of what the reversionary interest, if any, of the property would be. But given that circumstance, obviously the city needed to have them back off and to agree that there would not be opposition with respect to whether or not the High Line could go forward. So why wouldn't it be just as reasonable to assume that any of those benefits that they got from rezoning, which don't have anything to do with actual getting money for a taking of your property, that those benefits were in return for them backing off? Well, I would point, Your Honor, to the deposition, for example, of Mr. Toback, in which he explains how his consideration – this is in page 1687 of the Joint Appendix – his understanding – or how they're citing this contract for good and valuable consideration. And he said that his understanding of the consideration received by West Chelsea Buildings for this agreement was the creation of the special West Chelsea zoning district and the ability – They wanted it, right? Pardon? They wanted it. The plaintiffs here wanted the district and wanted the park. That's correct, Your Honor. I mean, they knew that the establishment of the park would – these plaintiffs were experienced businesspersons. They were represented by or consulted legal counsel. They knew that the creation of this unique urban space would increase property values. And, indeed, that's exactly what happened. And they were able to have these valuable development rights that they could transfer. And, Your Honor, to go back to Judge O'Malley's question regarding why it would not have been reasonable for the plaintiff to think that they were just trying to get the city to move forward, well, in this case, we do have – their bare assertions are rebutted by the evidence we put forward below, in which the senior counsel for the city, Mr. Gunn, who negotiated these agreements, said that what the city intended – that the city was aware of the potential for litigation against the United States and wanted to settle all matters relating to the High Line situ. So the city had every reason to – But he never testified that he even had any thought or understanding that they might be entitled to compensation from the United States in the form of a takings claim. And he just said, we wanted to make sure we could go forward and we wanted to put everything behind us. And getting compensation and going forward are unrelated. Well, respectfully, Your Honor, I would disagree in the sense that even though Mr. Gunn's declaration does not use the word taking in particular, in paragraph 21 of his declaration, he says that the city was aware of the potential for litigation against the United States. And in keeping with the city's desire to settle all matters related to the situ, they wanted the owners to agree not to sue the United States for compensation in connection with the situ. That's clearly expressed intent on the part of the city. For example, maybe they fear that any further litigation, a takings litigation, would tie up funding, tie up development, create bad PR, create all sorts of headaches that the city just did not want to deal with because what they wanted to do was to move forward with this deal. And indeed, that's what the plaintiffs, represented by counsel and as stated in their depositions, that's what the plaintiffs wanted as well. Your Honor, the plaintiffs simply provide no evidence offering a different motive for including this provision in the language of the agreement. Indeed, the clear language expressly names the U.S., and this stands in contrast to the agreement in Fourth Ocean, which plaintiffs discussed this morning, in which the plaintiff in Fourth Ocean was trying to seek to be a third-party beneficiary of a demolition contract between the city and a demolition company. And that plaintiff was never even explicitly named in that case. The court reasoned that, well, look, clearly, this was a case in which the city was concerned about public nuisance, and this was not about trying to give the plaintiff, the third party in that case, some sort of extra benefit about being able to ensure further development down the line for them. And that stands in stark contrast to this case where the United States is expressly named, and there is no other language in the agreement that would refute the party's intent here, which is the plain meaning of those words, that the owners agreed not to sue or seek compensation from the United States in relation to the High Line Sotu. And as Your Honors noted, that Fourth Ocean discusses reliance as one circumstance to look at, but indeed adopts the Restatement of Contracts, which in Section 302 states that one of the ways in which a party can establish that it is the intended third-party beneficiary is that the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance. And only the U.S. could really enforce this provision in here, and in fact, this is what the Court of Appeals in Fourth Ocean discussed as circumstances in which it's just and practical to allow enforcement by the third party. Is it your position that whenever the third party is identified by name in a contract that that's the end of the inquiry? That would not necessarily be the end of the inquiry. I think that as the case law sets out, the best evidence of intent of the contracting parties is the express language of the agreement itself, and we have that here. Now, in hypothetical situations where there may be other parts of the agreement that cast doubt on the fact of whether the party was intended to be a beneficiary or if there were surrounding circumstances, for example, if there was any evidence indicating that the owners didn't mean what they said when they said, oh, we promise not to sue the United States. So there are circumstances in which, given the totality of the facts, that there may be evidence rebutting what the clear language of the contract be, but that would have… But in this case went down on summary judgment, so that if there were that kind of evidence available, that argument, why should the other side not have had the opportunity to put on that kind of evidence? It's because they didn't make a sufficient threshold showing to defeat summary judgment in these circumstances? Well, that's correct, Your Honor, and that is what the CFC found, that when, in moving for summary judgment, the United States put forward below ample evidence, not only from Mr. Gunn, but also from Mr. Weinstein, the attorney for the Surface Transportation Board, as well as the depositions of counsel or representatives of the different plaintiff property owners here. And all of that evidence shows that the intent and the understanding was that this was part of a deal in which… They didn't come in in opposing summary judgment with any other evidence, right? That's correct, Your Honor, and summary judgment cannot be defeated by bare assertions from the other side. They have to put forward some showing, and they simply failed to do that, and that is why the Court of Federal Claims concluded that the United States had satisfied its showing on summary judgment here. Your Honor, to briefly address plaintiff's reference to the Chavez case, which they state, I believe, is their strongest case, supporting their point. Your Honor's line of questioning was exactly correct, that even though the customers in that case tried to claim that they were intended third-party beneficiaries, because the preamble language in that agreement showed that the employer was actually concerned about workers' compensation, and that because work-related injuries are covered by workers' compensation statutes, the parties wanted to avoid circumvention of state statutes through suits against customers of the employer. So there was language in that case, in that contract, that rebutted what the plaintiff there claimed was the intent of the contract to give them the benefit. And there, the intent was not to confer benefit on the defendants. And again, in contrast here, the actual intent of the parties is clear from the language. And, for example, as the appellate division found in the Edge Management case, where the parties – where the contract itself discussed, in that case, indemnification of other property owners, then another property owner whose apartment was damaged because of water damage from the unit above, well, that indemnification agreement covered against his loss, because that was clearly the intent. Additionally, other cases we cite in our brief, such as the appellate division's case in Rekkes v. Lake Minnewaska Mountain Houses, in that agreement, the contracting party actually benefited from the promise to the third party. But that did not erase the fact that there was an intended promise to the third party in that case, that Mr. Rekkes would be able to obtain the transfer of land as part of the Nature Conservancy's agreement there. Anything further? No, Your Honor. I guess I would just conclude by saying that there was nothing coercive about the deal that was reached here. The plaintiffs had a choice to decline to enter into the agreement and instead to seek compensation for takings. But there are risks involved in takings litigation. They were not guaranteed of a favorable result. There was no guarantee of what amount of compensation, if any, they would receive. So instead of taking that litigation risk, these experienced businesspersons, represented by counsel, chose the certainty of receiving what they don't contest, really, is valuable development rights that the record shows they sold for tens of millions of dollars. And in exchange for the certainty of receiving those benefits from the city, the plaintiffs agreed not to sue the city or the United States for compensation with respect to the High Line Situ. That's exactly what they're trying to do here, and they're trying to get a second bite of the apple by getting out of a contract provision. They don't claim that the contract itself is not valid or binding, perhaps because the contract really inures to their benefit. And in this case, the provision is valid. They don't contest that. And the United States is clearly the intended third-party beneficiary, and it's entitled to raise that defense. Okay. Thank you, Ms. Wendler. Thank you, Your Honor. Mr. Horne, you have two minutes. Thank you, Your Honor. Very briefly, no court has ever done what the court below did, which is to allow a supposed intended third-party beneficiary to enforce a covenant not to sue. Those are disfavored under New York law. No New York court nor any federal court applying New York law has ever done what the lower court did. The only case where they did consider a third party trying to assert a covenant not to sue, the court rejected their ability to do so. We see this as a very significant issue of New York law. It's one the lower court, the Court of Claims, did not have the ability to refer to New York courts. And this court does, if it's so inclined, have the ability to refer that question to New York courts. As to the issue of whether these owners receive some benefit as the supposed deal proposed, that's certainly not in the contract. There's no enforceable right in this agreement or any other agreement that gives them the right to any development rights. There's no evidence of what these are worth. And we would hotly dispute the value that supposedly is conferred to them, which is not limited to them, but anybody in this whole neighborhood could be rezoned. And evidence in this record, the allegations show that those discussions and rezoning was going forward well before this whole conversion of the High Line came up. And additionally, these owners, among other owners, including the city itself, for more than 20 years, hotly sought to contest the continued existence of the High Line, wanted this structure removed, and went to the STB in litigation to try to compel them to abandon it, which they did before the agreements, which is a point, Judge O'Malley, that you made. Finally, I'd note that the government's argument, if you accept their contention that the mere existence of this covenant not to sue, which mentions the United States, confers on them intended third-party beneficiary status under New York law, then there is no distinction between an incidental beneficiary and an intended beneficiary under New York law. And that distinction, which is critical to New York law, has been eliminated. Thank you. Thank you, Mr. Hall. Thank both counsel. The case is submitted.